UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

INVESCO INSTITUTIONAL (N.A.), INC.                                        PLAINTIFF

v.                                                        CIVIL ACTION NO. 3:07-CV-175-R

RANDY G. PAAS, et al.                                                     DEFENDANTS

## MEMORANDUM OPINION AND ORDER

a.      **Background.**

        This lawsuit involves a dispute over the employment contracts of four senior

employees sued by their employer.  The employees are all high-level investment managers

employed by an international financial services firm as "Global Partners" in its Worldwide Fixed

Income Group (hereinafter "WFI").  The WFI manages fixed income investments for the

Plaintiff, Invesco Institutional (N.A.), Inc. (hereinafter "Invesco").  Only six Global Partners

among 88 investment professionals work in the WFI Group, which is located in Louisville,

Kentucky.  All four of the Global Partners sued by Invesco currently are represented by attorney

John Sheller and the law firm of Stoll Keenon Ogdon, PLLC (hereinafter "SKO").[1]

        On March 26, 2007, the Defendant Global Partners each gave written notice to

Invesco of their intent to terminate their employment.  Section 3A of each Defendant's Global

Partner Agreement provided that either the affected Global Partner or Invesco could terminate

the employment relationship at any time on 12 months written notice.  Each agreement further

provided that whether the partner or Invesco gave notice of termination, the employment

_____

        [1] Prior to April 1, 2007, Sheller and the law firm, Smith & Smith, represented the
Defendant employees.

relationship would continue for the entire notice period.[2]

Invesco responded to this development by firing partner Randy Paas and immediately filing suit against him on March 27, 2007 (DN 1).  The next day, Invesco filed suit against all four of the Defendant Global Partners (DNs 1, 4).  Invesco alleged in its amended complaint that the four partners had been in secret communication with Deutsche Investment Management Americas, Inc. (hereinafter "Deutsche") about leaving Invesco to obtain employment with Deutsche, one of Invesco's competitors.  These secret discussions allegedly involved the partners' improper disclosure of Invesco's confidential information to facilitate a plan by Deutsche to hire away not only the partners, but a substantial number of key WFI personnel, as well.

Invesco asserted claims for breach of contract, trade secret violation, inevitable disclosure of trade secrets, breach of fiduciary duty, unfair competition and conspiracy in its amended complaint (DN 4).  It requested a preliminary injunction to prevent irreparable harm allegedly caused by the "lift out" of its WFI employees "at the hands of the Global Partner Defendants."  (DN 4, Amended Complaint, p. 7, ¶ 25).  The partners also requested injunctive relief of their own to permit them to begin employment with Deutsche.

Invesco followed its amended complaint with a motion for expedited discovery (DN 5) to prepare for a preliminary injunction hearing (DN 31).  The Global Partners also requested expedited discovery for the purpose of their request for injunctive relief (DN 16).  The District Court granted the motion to expedite discovery according to the terms of a consent order

---

[2]  The Global Partner Employment Agreements are attached as Exhibits A through D to the amended complaint filed by Invesco (DN 4).

entered by the parties (DN 32).  A preliminary injunction hearing is now set before the District

Court for June 13, 2007.

**b.      The Dispute.**

The present discovery dispute involves a series of subpoenas duces tecum served

by Invesco on attorney Sheller, his former law firm, and his current firm.  Sheller was in

Paducah on Sunday, May 6, 2007, for a TRO hearing when he was personally served with one

subpoena duces tecum by Invesco's counsel.  He was served with a second subpoena duces

tecum as agent for SKO at the same time.  Both subpoenas were issued on behalf of Invesco by

the District Court for the Western District of Kentucky.  Each commanded the production of

"documents comprising or concerning any communications" by Sheller or by SKO with the

Defendant Global Partners, Deutsche, or Russell, Reynolds Associates, Inc. (hereinafter

"RRA")[3] concerning the Defendant employees "potentially leaving Invesco and joining

Deutsche."  (DN 65, Exhs. A and B, Schedule A, document request 1-7).   The subpoena to

Sheller sought to obtain these documents in conjunction with his deposition.

Smith & Smith received the third subpoena duces tecum from Invesco on May 14,

2007.  This subpoena duces tecum, as with the other subpoenas, was issued by the District Court

for the Western District of Kentucky on behalf of Invesco.  It also sought to obtain all documents

reflecting any contact or communication between Smith & Smith, the Defendant partners,

Deutsche, or RRA, concerning the partners potentially leaving Invesco and joining Deutsche

---

[3]  Russell, Reynolds Assoc., Inc., is a firm specializing in the employment personnel
needs of its clients.  The firm is referred to occasionally in the filings of the Plaintiff as being a
"headhunter" agency.

(DN 97, Exh. 1, Schedule A, document request 1-7).

The three subpoenas resulted in a series of motions to quash and objections pursuant to Rule 45(c) of the Federal Rules of Civil Procedure.  Sheller and SKO filed the first motion to quash (DN 65) on May 9, 2007.  Smith & Smith followed with a similar motion to quash and objection (DN 97) on May 18, 2007.  Attorney Sheller, in his individual capacity, filed a separate motion to quash and objection on May 24, 2007.[4]  (DN 113).

Invesco filed a response on May 17, 2007, to the original motion to quash filed by Sheller and SKO (DN 93).  It simultaneously filed a motion to compel compliance with the subpoenas (DN 92).  Invesco then filed a response to the motion to quash filed by Smith & Smith, along with a motion to compel compliance (DNs 100, 101).  Sheller and SKO filed a reply in support of their motion to quash (DN 114), combined with a response to Invesco's motion to compel compliance with the subpoenas (DN 115).  Invesco filed a reply in support of the motion to compel (DN 119), as well as response to Sheller's individual motion to quash (DN 138).

The Magistrate Judge conducted a telephonic conference with counsel for the parties on Tuesday, May 22, 2007, to discuss the pending motions.  Based on his own review of the motion papers, the Magistrate Judge directed SKO and Smith & Smith to produce the subpoenaed documents for *in camera* review to determine whether such documents could properly be obtained by subpoena.[5]

---

[4]  Sheller is represented in his individual capacity by separate counsel, Edward H. Stopher and Clinton J. Elliott.

[5]  Attorney Sheller, in his individual capacity, has none of the requested documents in his possession.  The documents, or portions thereof, are instead in the possession, custody and

**Legal Arguments.**

a.      **Movants' Arguments.**

Sheller, SKO and Smith & Smith (hereinafter "the movants") have all moved the Court to quash the subpoenas issued on behalf of Invesco.  All of the movants raise similar arguments in support of their respective motions, which are filed pursuant to Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure.  This Rule provides that the Court shall quash or modify a subpoena if it fails to allow reasonable time for compliance, requires the disclosure of privileged or otherwise protected materials or subjects the movants to undue burden.  See Fed.R.Civ.P. 45(c)(3)(A)(i), (iii), (v).  See gen. 9a Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure, § 2459 (Second Ed. 2006) (discussing Rule 45(c)(3)).

The movants, as such, bear the burden of establishing that the issued subpoenas run afoul of the cited provisions of the rule.  See Pollitt v. Mobay Chemical Corp., 95 F.R.D. 101, 106 (S.D. Ohio 1982) ("The burden is on the movant opposing the subpoena to demonstrate that it is unreasonable or oppressive.") (citing United States v. 691.81 Acres of Land, 443 F.2d 461, 462 (6th Cir. 1971) (per curiam)).

Here, the movants insist that Invesco's subpoenas "violate every applicable provision of Rule 45(c)(3)(A)."  (DN 65, Memo. p. 4).  They maintain that the Invesco subpoenas are not only overly broad and invasive, but also seek to obtain "a wide array of documents protected by the attorney-client, work product, and possibly other privileges...."  (Id.).  They insist that the subpoenas were "purposely drafted to invade the privileged attorney-client communication between [the] movants and Defendants and eviscerate the privileged work

_____

control of his current and former law firms, SKO and Smith & Smith, respectively.

5

product of [the] movants."  (<u>Id</u>.).

The movants argue that both Kentucky Rules of Evidence (KRE) 503 and KRE 501 protect all communications between counsel, acting as such, and the Defendants concerning their desire to obtain employment with Deutsche.  They argue that Invesco has not established the applicability of any exception, including the crime-fraud exception of KRE 503(d)(1), that would permit Invesco to obtain their otherwise privileged communications.  On this point, they insist that Invesco has offered no proof that the services of Sheller, SKO or Smith & Smith were ever sought or obtained by the Defendants for the purpose of enabling them to commit or plan to commit a crime or fraud, as required by the controlling case law in Kentucky on the crime-fraud exception to the attorney-client privilege.  <u>See</u> <u>Steelvest v. Scansteel Service Center</u>, 807 S.W.2d 476, 487-88 (Ky. 1991); <u>Kopowski v. Standard Life Ins. Co. of Indiana</u>, Appeal No. 2005-SC-000005-MR, 2005 WL 2045448 (Ky. Aug. 25, 2005).  <u>See also</u> <u>Stidham v. Clark</u>, 74 S.W.3d 719, 723-27 (Ky. 2002) (discussing the crime fraud exception to the psychotherapist-patient privilege).

The movants further argue that the challenged subpoenas should be quashed because they attempt to invade the attorney work product protection, a doctrine designed to shield an attorney's efforts to prepare, assemble, analyze and use important facts and legal theories to a client's best interest without undue interference.  <u>See</u> <u>Hickman v. Taylor</u>, 329 U.S. 495, 510 (1947); <u>In re Columbia/HCA Healthcare Corp. Billing Practices Litigation</u>, 293 F.3d 289, 294 (6th Cir. 2002).  They maintain that the subpoenas appear to be drafted specifically to sweep up counsel's internal notes, e-mail, memoranda and other work product materials, despite the fact that the movants have not waived their work product protection in any fashion.  (<u>Id</u>. at p.

6

6).  Finally, irrespective of these arguments, the movants add that subpoenas simply failed to allow the respondents a reasonable time to comply, given that Invesco demanded the production of an extraordinarily broad range of documents within a matter of a few days.

**b.      Invesco's Arguments.**

Invesco not surprisingly takes a different view.  Its position is summarized in its combined response to the initial motion to quash and its motion to compel (DNs 92, 93). Invesco maintains that ample evidence shows that in the months leading up to the attempted lift-out, the Global Partners sought legal advice from attorney Sheller in connection with their change of employment, while at the same time "they engaged in blatant violations of the[ir] fiduciary duties ... to Invesco."  (DN 93, Memorandum p. 2).  Citing to a deposition of Deutsche employees Bart Grenier and Kevin Parker (DN 93, Exhs. A and B), Invesco maintains that the Global Partners had planned their move to Deutsche for months before they gave notice in late March 2007.  During this time, the partners allegedly disclosed confidential information to Deutsche concerning Invesco employees, its proprietary investment software and perceived strategic weaknesses in information management and sales force organization.

Invesco now insists that these alleged fiduciary violations by the partners are treated in the law as being the equivalent of fraud for the purpose of the crime-fraud exception to the attorney-client privilege set forth in KRE 503(d)(1).[6]  Because attorney Sheller and both

_____

[6]  The crime-fraud exception of KRE 503(d)(1) provides that no attorney-client privilege will exist under KRE 503, "If the services of a lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."  KRE 503(d)(1).  See Steelvest, 807 S.W.2d 476, 487-88 (Ky. 1991) (Attorney-client privilege did not apply to protect from discovery communications between an

named law firms allegedly assisted the Global Partners in the violation of their contractual and common law fiduciary duties, all of the requested communications according to Invesco are stripped of any attorney-client privilege or work product protection and therefore are entirely discoverable.  Further, Invesco maintains that, regardless of the crime-fraud exception, any communications between the movants and Deutsche or RRA were never even arguably protected from discovery by the attorney-client privilege or by the work product doctrine.[7]

Invesco correctly points out that in the <u>Steelvest</u> decision, the Supreme Court of Kentucky placed the "breach of fiduciary relationship on an equal par with fraud and deceit" for the purpose of the crime-fraud exception to the attorney-client privilege.  <u>Steelvest</u>, 807 S.W.2d at 487-88.  Invesco reasons that the Global Partners likewise breached their fiduciary duty, as confirmed by the deposition testimony of Parker and Grenier, by providing Deutsche otherwise confidential information concerning Invesco's computer system (the "Q Tech" system), the identities of key WFI employees to be hired away, income projections and perceived strategic weaknesses in the sales organization of Invesco.

Based on <u>Steelvest</u> and the aforementioned deposition testimony, Invesco

---

attorney and a corporate officer who was secretly setting up a competing business while still employed by the plaintiff employer where the attorney presumably knew that his client's plans to form a competing corporation constituted a breach of his fiduciary duties, yet continued to assist him).

[7] Invesco and the Defendants are in agreement that any claims of attorney-client privilege are determined under Kentucky law.  <u>See</u> <u>Willits v. Peabody Coal Co.</u>, Case Nos. 90-0034/0147/0148/0064-O(CS), 1993 WL 35249 at *2 (W.D. Ky. Jan. 11, 1993) (FRE "501 provides that in civil cases, privileges are governed by state law.") (citing <u>Wylie v. The Marley Co.</u>, 891 F.2d 1463 (10th Cir. 1989)).  As noted, KRE 503(d)(1) provides for an exception to the attorney-client privilege arising under KRE 503(b) if the services of an attorney were obtained to enable the client to plan or commit what the client knew, or reasonably should have known, to be a crime or a fraud. KRE 503(d)(1).

concludes that Sheller, SKO and Smith & Smith cannot now seize upon the attorney-client privilege to prevent it from discovering the full scope of the partners' violation of their fiduciaries duties.  Invesco argues that the Global Partners undoubtedly had both common law and contractual fiduciary duties, given their positions of trust, freedom of decision making and access to Invesco's confidential corporate information.  See Aero Drapery of Kentucky, Inc. v. Engdahl, 507 S.W.2d 166, 168 (Ky. 1974); Stewart v. Kentucky Paving Co., 557 S.W.2d 435, 438 (Ky. App. 1977).  See also DSG Corp. v. Anderson, 754 F.2d 678, 682 (6th Cir. 1985).[8] Accordingly, Invesco concludes that the evidence currently of record is more than adequate to establish the necessary factual predicate to apply the crime-fraud exception.  Consequently, the subpoenaed documents are discoverable in the view of Invesco, despite the movants' attempted claim of privilege.

Invesco applies the same reasoning with regard to the Global Partners' claim of work product protection.  Once again, Invesco turns to the crime-fraud exception, which according to Willits, 1993 WL 35249 at *6, applies to require the production of both fact and

---

[8]  Invesco quotes from the following portion of the Global Partnership Agreement signed by each of the Defendant employees as evidence of each partner's contractual fiduciary duties The Global Partner Agreements each provide that:

> As a Global Partner you have important duties to the Company: the duty to refrain from dealing in your self interest above that of the Company's, the duty to disclose any information that indicates you may be exposed to a conflict of interest, the duty of loyalty, and the duty to refrain from using the Company's business opportunities for your own benefit.  These fiduciary obligations and others arise because of the unique trust and confidence the Company places in you as a Global Partner.

(DN 4, amended complaint, Exhs. A-D at p. 1, section 1.

opinion work product materials when the requesting party comes forward with evidence

sufficient to cause a prudent person to suspect that a crime or fraud has been perpetrated.  See In

re Antitrust Grand Jury, 805 F.2d 155, 165-66 (6th Cir. 1986) (applying the crime-fraud

exception to the work product doctrine in the context of a grand jury investigation); In re Grand

Jury Subpoena, 419F.3d 329, 335 (6th Cir. 2005) (Work product doctrine, just at the attorney-

client privilege, is subject to the crime-fraud exception.).

       Invesco adds that apart from the crime-fraud exception to the work product

doctrine, the requested documents still would be subject to discovery, given the requirements of

the work product doctrine under Fed.R.Civ.P. 26(b)(3).  See Regional Airport of Louisville v.

LFG, LLC, 460 F.3d 697 (6th Cir. 2006); Toledo Edison Co. v. G.A. Technologies, Inc., 847 F.2d

335, 339 (6th Cir. 1988).  Invesco reasons that the documents sought are directly relevant to its

claims, that no proof currently establishes that the requested documents were prepared in

anticipation of litigation (despite the movants' claims to the contrary) and that Invesco has a

"substantial need" for these materials, as no "substantial equivalent" of them may be obtained

without undue hardship.  Invesco concludes with the closing argument that when its subpoenas

are viewed in the context of the current posture of the case, which involves expedited discovery,

more than reasonable time has been allowed for compliance.  Even were that not so, Invesco

points out that the remedy would not be to quash the subpoenas, but to extend the time for

response.

## LEGAL ANALYSIS

       The role of the Court in this matter is essentially threefold.  First, the Court must

determine whether the documents sought by Invesco are relevant within the context of Rule

26(b)(1).  Fed.R.Civ.P. 26(b)(1).  Only information that is relevant to a claim or defense falls

within the scope of discovery under the express language of the Rule.  If the information sought

is otherwise discoverable, or would lead to the discovery of relevant evidence, then the second

question for the Court is whether such otherwise discoverable information is protected from

disclosure by the attorney-client or work product doctrine.  At this step of the analysis, the Court

applies the law of Kentucky, and analogous federal law, to determine if the Defendants have

established the existence of the privilege.  If so, the Court must decide whether Invesco has

shown that the crime-fraud exception to the attorney-client privilege and work product doctrine

applies under KRE 503(d)(1), as interpreted by Willits, Steelvest, Stidham and Kapowski, so as

to require the production of the subpoenaed documents.


a.      **Scope of Discovery Under Rule 26(b)(1)**.

                Rule 26(b)(1) provides that "the parties may obtain discovery regarding any

matter not privileged, that is relevant to the claim or defense of any party...."  Fed.R.Civ.P.

26(b)(1).  Relevant material for the purpose of discovery will encompass any matter that may

bear upon, or reasonably could lead to other matters that could bear upon, any issue that is or

likely may be raised in the case.  Minch v. City of Chicago, 213 F.R.D. 526, 527 (N.D. Ill.

2003).  In other words, a request for discovery should be considered to be seeking relevant

information if there is *any* possibility that the information sought may be relevant to the claim or

defense of any party in the action.  Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto

Servicenter, 211 F.R.D. 658, 663 (D. Kan. 2003).  So long as the information sought appears

reasonably calculated to lead to the discovery of admissible evidence, the information itself need

not be admissible at trial.  Burlington Industry v. Okie Dokie, Inc., 368 F. Supp.2d 83, 86 (D.D.C. 2005).

        The federal courts, even after the amendment of Rule 26(b) in 2000, have continued to hold that, "Relevance for the purpose of Rule 26 is broadly construed."  See, Jade Trading, LLC v. United States, 65 Fed. Cl. 188, 190-91 (Fed. Cir. 2005) (citing Katz v. Batavia Marine & Sporting Supplies, 984 F.2d 422, 424 (Fed. Cir. 1993)).  See gen., Harris v. Nelson, 394 U.S. 286, 297 (1969) ("This rule has been generously construed to provide a great deal of latitude for discovery."); 8 Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure, (2nd ed. 1987) ("The rule does allow a broad scope to discovery and has been well recognized by the courts.").  Accordingly, the scope of discovery under Rule 26(b)(1) after the 2000 amendment, although perhaps somewhat narrower, is not dramatically different and broad discovery remains the norm.  See, Sanyo Laser Products, Inc. v. Arista Records, Inc., 214 F.R.D. 496, 498-5000 (S.D. Ind. 2003).

        When the discovery material sought appears to be relevant, the party who is resisting production has the burden to establish that the material either does not come within the scope of relevance or is of such marginal relevance that the potential harm resulting from production outweighs the presumption in favor of broad disclosure.  Horizon Holdings, LLC v. Genmar Holdings, Inc., 209 F.R.D. 208, 211-212 (D. Kan. 2002).  A party who seeks to avoid disclosure of requested materials "bears a heavy burden of demonstrating that disclosure will work a clearly defined and very serious injury ..."  Empire of Carolina, Inc. v. Mickle, 108 F.R.D. 323, 326 (S.D. Fla. 1985) (citing Citicorp v. Interbank Card Associates, 478 F.Supp. 756 (S.D. N.Y. 1979)).  Courts generally do not grant protective orders without a strong showing of

good cause, and the burden of establishing good cause falls on the party who seeks such an order.  Howard v. Galesi, 107 F.R.D. 348, 400 (S.D.N.Y. 1985) (citing 8 Charles Alan Wright & Arthur Miller, Federal Practice & Procedure, § 2035 (1st ed. 1970)).  See also, Cipollone v. Liggett Group, Inc., 106 F.R.D. 573 (D.N.J. 1985) ("The party seeking a protective order under this section bears the burden of proving its necessity.").

   Little dispute is raised by the parties concerning this threshold issue.  All of the subpoenas duces tecum contain an identical attachment, Schedule A, that seeks a broad range of documents that involve the decision of the Defendants to leave Invesco to take employment with Deutsche.  No one suggests that factual information concerning the intended employment change of the Defendants is irrelevant.  Clearly, any such facts would relate to the claims of Invesco that the actions of the Global Partners with regard to Deutsche not only violated the express terms of their contract, but also the fiduciary duties therein and their common law fiduciary duties.

   The Court cannot make the same unequivocal pronouncement to the extent that the seven document requests of Schedule A may be reasonably interpreted to seek the mental impressions and opinions of attorney Sheller or his past or present law firm concerning the legality of the Defendant partners' conduct or the legal strategy by which the movants seek to protect the interests of their clients.  These matters, separate and apart from the facts related to the conduct of the partners, raise serious questions that involve the fundamental principles of both (1) the attorney-client privilege, to the extent that the document requests include confidential communications by the partners to or from their counsel for the purpose of obtaining legal advice; and (2) the work product doctrine, to the extent that the document requests include those materials prepared by counsel in anticipation of the present or related litigation involving

13

Invesco, Deutsche and/or the Global Partners.  These observations bring the Court to its next

task which is to briefly summarize the law as it relates both to the attorney-client privilege and

the work product doctrine.

**b.      Attorney-Client Privilege.**

**1.      Federal Law.**

The privilege for confidential communications between an attorney and client is

"the oldest of the privileges for confidential communications known to the common law."

United States v. Zolin, 491 U.S. 554, 563 (1989) (citing Upjohn Co. v. United States, 449 U.S.

383, 389 (1981)).  The privilege at federal law extends to those confidential disclosures by a

client to an attorney, or his or her representative, made in order to obtain legal advice.  United

States v. Moss, 9 F.3d 543, 550-51 (6th Cir. 1993) (citing Haines v. Liggett Group, Inc., 975 F.2d

81, 94 (3rd Cir. 1992) (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)).

Although the fundamental rationale for the privilege has varied over time, see 8 J.

Wigmore Evidence, § 2290 (McNaughton 1961), courts have long held the central concern of the

privilege is "to encourage full and frank communication between attorneys and their clients and

thereby promote broader public interest in the observance of law in administration of justice."

Upjohn, 449 U.S. at 389. When properly applied, clients may rely upon this vital privilege to

confidentially disclose to their attorney possible past wrongdoings, Fisher v. United States, 425

U.S. at 403, so that they may obtain the assistance of one skilled in the knowledge and practice

of the law.  Hunt v. Blackburn, 128 U.S. 464, 470 (1888).

Because the proper exercise of the attorney-client privilege will often result in the

nondisclosure of highly relevant information, it has been held to apply only where necessary to achieve its fundamental purpose.  <u>Fisher</u>, 425 U.S. at 403; <u>In re Antitrust Grand Jury</u>, 805 F.2d 155, 162 (6th Cir. 1986) ("[The attorney-client privilege] ... applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice.")

   Under Rule 503(b) of the Kentucky Rules of Evidence, the general rule of privilege is that "a client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client...."  KRE 503(b).  The Rule continues in subsections (b)(1) through (b)(5) to set out in detail the individuals between whom such confidential communications are protected.  <u>Id</u>. The elements of the attorney-client privilege at federal common law, similar to Kentucky law, require that legal advice of any kind be sought from a legal adviser in his capacity as such, so that the communications relating to that purpose, that are made in confidence by the client, are permanently protected at the client's insistence from disclosure by the legal adviser, unless the legal protection is waived.  <u>See</u> <u>Reed v. Baxter</u>, 134 F.3d 351, 355-56 (6th Cir. 1998), <u>cert. denied</u>, 525 U.S. 820 (1998).

   The fundamental importance of confidentiality in attorney-client communications is extinguished, however, at the point when the client desires to obtain legal advice not in relation to a possible prior wrongdoing, but to plan or facilitate future wrongdoing.  <u>Zolin</u>, 491 U.S. at 563-64 (citing <u>Clark v. United States</u>, 289 U.S. 1, 15 (1933)).  Hence, the crime-fraud exception to the attorney-client privilege arises to assure that the "seal of secrecy" between a lawyer and client does not extend to those otherwise confidential communications "made for the purpose of getting advice for the commission of a fraud or crime."  <u>Id</u>.

This exception to the attorney-client privilege was first recognized in the federal law by the United States Supreme Court over 100 years ago in Alexander v. United States, 138 U.S. 353 (1891).  The high court revisited the crime-fraud exception some 40 years later in Clark v. United States, 289 U.S. 1 (1933), wherein the court elaborated that the exception applies even if an attorney is unaware of the client's fraud.  Subsequently, the Supreme Court in Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343 (1985) recognized that this exception to the attorney-client privilege related not only to the planning or permission of ongoing fraud and crimes, but also to ordinary torts, as well.  In Weintraub, the court explained that a party who seeks to invoke this exception must make a threshold showing that it is applicable in order to avoid the privilege. A mere accusation of wrongdoing, without more, is not sufficient to extinguish the privilege.  Such a result, Weintraub explains, would be absurd if the attorney-client privilege were to be rendered inapplicable merely upon a bald allegation of fraud, rather than *prima facie* evidence that the charge of fraud has some foundation in fact.  Id.

Four years after Weintraub, the Supreme Court in Zolin held that the federal courts are entitled to make an *in camera* examination of the allegedly privileged materials in order to determine whether the crime-fraud exception applies once the party challenging the privilege makes a threshold showing of a factual basis adequate to support a good-faith belief by a reasonable person that such limited *in camera* review may reveal evidence to establish that the crime-fraud exception does apply.  Zolin, 491 U.S. at 572-73.

Once this lesser evidentiary showing, sometimes characterized as being a probable cause showing, is made, then the District Court may exercise its discretion to conduct an *in camera* review.  Id.  This exercise of discretion depends on the facts and circumstances of

16

the case, the volume of the materials the District Court must review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced for *in camera* review, along with other available evidence, will establish that the crime-fraud exception applies.  Id.

The test of Zolin to establish the crime-fraud exception has been adopted in a number of federal decisions in the Sixth Circuit.  The most recent decision is Rainer v. Union Carbide Corp., 402 F.3d 608, 625 (6th Cir. 2005), cert. denied, 126 S.Ct. 562 (2005).  Rainer explains, "The test for claiming the crime-fraud exception is twofold:  'First, the [party desiring production] ... must make a *prima facie* showing that a sufficiently serious crime or fraud occurred to defeat the privilege; second, the [party] ... must establish some relationship between the communication at issue and the *prima facie* violation.'"  Id. (citing In re Antitrust Grand Jury, 805 F.2d at 164)).  The Sixth Circuit earlier explained in United States v. Collis, 128 F.3d 313, 320-21 (6th Cir. 1997) that, "To satisfy its *prima facie* showing, the evidence presented by the [party seeking production] ... must be such that 'a prudent person [would] have a reasonable basis to suspect the perpetration of a crime or fraud.'"  Id. (citing In re Antitrust Grand Jury, 805 F.2d at 164)).

This same two-part test first discussed in In re Antitrust Grand Jury, 805 F.2d at 164 has been repeated in a number of lower federal courts throughout the Sixth Circuit.  See In re Southern Air Transport, Inc., 255 B.R. 706, 714 (Bankr. S.D. Ohio 2000); In re Miller, 247 B.R. 704, 711-13 (Bankr. N.D. Ohio 2000); Royal Surplus Lines Ins. Co. v. Sofamore Danek Group, Inc., 190 F.R.D. 505, 510-11 (W.D. Tenn. 1999) (noting that the Sixth Circuit has continued to apply the two-prong approach of In re Antitrust Grand Jury in favor of the Third

17

Circuit test of <u>Haines v. Leggitt</u>, 975 F.2d at 95-96).

### 2.      Kentucky law.

The same principles that govern the crime-fraud exception to the attorney-client privilege at federal law have found their way into both the common law and the codified law of Kentucky.  In <u>Steelvest v. Scansteel Service Center</u>, 807 S.W.2d 476, 487 (Ky. 1991), the Supreme Court of Kentucky, similar to <u>Zolin</u>, recognized that the privilege is generally deemed to be absolute when it involves those confidential communications between an attorney and client about past transgressions or offenses.  <u>Id</u>. (citing <u>Cummings v. Commonwealth</u>, 298 S.W. 943 (Ky. 1927)).  The privilege does not apply to future wrongs, however, as <u>Steelvest</u> correctly recognizes, when a client seeks advice that contemplates the future commission of a crime or the perpetration of a fraud.  <u>Id</u>.

In <u>Steelvest</u>, attorney Kaelin was consulted by a corporate officer, Scanlan, who with the assistance of Kaelin secretly formed a company to compete with his employer, Steelvest.  Steelvest sought to obtain discovery of Scanlan's communications with Kaelin concerning the formation of the competing entity, Scansteel Service Center.  Its discovery request was based on the argument that any such communications lost their privileged character given that Kaelin's services were obtained in furtherance of Scanlan's known breach of fiduciary duty to his employer amounting to a fraud.

The Kentucky Supreme Court in <u>Steelvest</u> began by noting that under Kentucky law, tort liability arises for one who interferes with a known contractual relationship if he does so maliciously or without justification, or the interference is accomplished by an unlawful means

such as fraud, deceit or coercion.  Steelvest, 807 S.W.2d at 487 (citing Derby Roadbuilding Co. v. Commonwealth, Dept. of Highways, 317 S.W.2d 891 (1958)).  The court then continued to reason that "we would presume to place the breach of fiduciary duty on an equal par with fraud and deceit."  Id. (citing Henkin, Inc. v. Berea Bank and Trust Co., 566 S.W.2d 420 (Ky. App. 1978)).  The court accordingly held as a matter of law that a breach of fiduciary duty is the equivalent to fraud.

Because Kaelin advised Scanlan in his efforts to form Scansteel during the time that Scanlan was still employed by Steelvest, the court presumed that Kaelin, as an attorney, was aware that Scanlan's activities constituted a breach of fiduciary duty, but continued to assist him regardless.  Id. at 488.  Under such circumstances, "With some showing of a breach of fiduciary duties on the part of Scanlan, we hold that the attorney-client privilege cannot be used to prevent discovery of the requested information."  Id.

Subsequently, the Supreme Court of Kentucky in Stidham v. Clark, 74 S.W.3d 719, 725-727 (Ky. 2002) a decade later addressed the question of "What is the quantum of proof necessary to overcome an otherwise established claim of privilege?"  Id. at 725.  The privilege at issue in Stidham was not the attorney-client privilege itself, but rather the psychotherapist-patient privilege, which a defendant sought to assert to prevent the release of certain grand jury records pertaining to his treatment by a licensed psychiatrist.  The Commonwealth sought to overcome the privilege, by arguing that those entries in the psychiatrist's record that established the efforts of the defendant to unlawfully obtain controlled substances in violation of KRS 218A.140(1) were not privileged.

In addressing the question of the burden of proof, the Kentucky Supreme Court

19

turned to federal law, in particular the earlier-mentioned decisions of the United States Supreme Court in Clark v. United States, 289 U.S. 1, 14 (1933), and United States v. Zolin, 491 U.S. 554, 572 (1989).  The court noted that under Clark and Zolin, the prevailing standard in the federal courts required a party seeking to challenge a privilege, such as the attorney-client privilege, to show a *prima facie* case sufficient to "satisfy the judge that the light should be let in."  Stidham, 74 S.W.3d at 726.  The court continued to adopt the approach announced in Zolin that permits a reviewing court to examine the allegedly privileged materials *in camera* to determine whether the asserted privilege has been waived or the materials at issue fall outside the scope of the privilege or are subject to a specified exception.  Stidham, 74 S.W.3d at 727.

In reaching this conclusion, the Kentucky Supreme Court agreed that, "A bare allegation of a criminal purpose is insufficient to warrant an *in camera* review," as such a standard would permit "'opponents of the privilege to engage in groundless fishing expeditions with [trial] courts as their unwitting (and perhaps unwilling) agents.'"  Id. (citing Zolin, 491 U.S. at 571).  The court then continued to agree with Zolin that a lesser evidentiary showing is needed to trigger *in camera* review than is required to overcome the privilege.  Id.  In accordance with Zolin, the court found that the party challenging the privilege must present evidence sufficient to support a reasonable belief that *in camera* review might yield evidence that establishes the applicability of the asserted exception to the privilege.  Id. ("We agree and now adopt that standard [of Zolin] as applicable to requests for *in camera* review with respect to claims of privilege under Kentucky law.").

More recently, the Supreme Court of Kentucky returned to both Zolin and Stidham in the unpublished decision of Kopowski v. Standard Life Ins. Co. of Indiana, Case No.

20

2005-SC-000005-MR, 2005 WL 2045448 (Ky. Aug. 25, 2005).  <u>Kopowski</u> involved an original

action brought in the Kentucky Court of Appeals by an insurance company in an effort to

prevent the disclosure of certain attorney-client communications that arose during a meeting of

its general and associate counsel with the company president concerning certain allegedly

fraudulent conduct by one of the company's agents, George Fiorini. The company, Standard Life

Insurance Company of Indiana, had been sued by husband and wife investors, Fred and Dolores

Macke, who had been persuaded by Fiorini to invest in an investment plan known as the

"Income Plus Plan" which was in actuality an investment in certain of the company's insurance

products along with certain bogus trusts operated by Fiorini.

After various clients, including the Mackes, began to complain, Standard's

counsel and president held a series of private meetings ostensibly concerning Fiorini's conduct.

The Mackes filed a motion in the trial court to compel testimony from Standard's in-house

counsel and president concerning the substance of these meetings.  Standard asserted the

attorney-client privilege.  In response, the Mackes argued that the conversations fell within the

crime-fraud exception under KRE 503(d)(1), as the company's representatives allegedly sought

legal advice "in furtherance of crime or fraud."  The trial court agreed that the Mackes had made

a sufficient showing to compel production of the allegedly privileged attorney-client

communications.  This ruling led Standard to file an original action in the court of appeals,

which entered a writ of prohibition to preclude the trial court from enforcing its order to compel

production.

On appeal, the Kentucky Supreme Court affirmed the decision of the Kentucky

Court of Appeals.  In doing so, the Supreme Court in <u>Kopowski</u> first reiterated the principle of

Zolin that bare allegations of a criminal purpose are insufficient to overcome the attorney-client

privilege as under Stidham, "There must be proof by a preponderance of the evidence that an

exception to the attorney-client privilege applies before the privilege can be defeated."

Accordingly, the court explained that the Mackes "must prove by a preponderance of the

evidence that *the communications in question* furthered a crime or fraud before the privilege can

be defeated." Kopowski, 2005 WL 2045448 at *3 (emphasis added).

In applying this standard, the Kentucky Supreme Court rejected the argument that

the mere occurrence of the meetings after Fiorini's alleged fraud was sufficient, based on the

chronology of the facts, to compel production of the privileged materials.  The court wrote on

this point that:

> We agree and affirm the Court of Appeals' decision.  The crucial
> determinative factor is that Appellants have failed to prove by a
> preponderance of the evidence that the conversations between
> Standard's executives and their in-house counsel were intended to,
> or did, further a crime or fraud.  Whether or not Appellants have
> successfully proven Fiorini's fraudulent activities can in some way
> be connected Standard is of little relevance without a finding that
> the conversations in question were made to further any such crime
> or fraud.
>
> Because we find Appellants failed to prove the crime-fraud
> exception to the attorney-client privilege, we agree with the Court
> of Appeals that the trial court abused its discretion in granting
> Appellants' motion to compel.

Id. at *4.

The Kentucky Supreme Court did note, however, that the Mackes remained

entitled to depose any representative of Standard Life concerning his or her actions or knowledge

of a plan by Standard or Fiorini to perpetrate a fraud on the Mackes, so long as the attorney-

client privileged conversations were not revealed.  Indeed, the court noted that the trial court

remained empowered to conduct an *in camera* review of the otherwise privileged conversations in order to determine if the crime-fraud exception applied based on the gist of such communications.  Id.  In making this observation, the court reaffirmed that under Zolin a lesser evidentiary showing is needed to trigger such *in camera* review than is required to overcome the privilege.  Accordingly, the trial court remained able to determine whether the lesser evidentiary standard had been satisfied to permit such review of the materials sought by the Mackes.

Examination of the Steelvest, Stidham and Kopowski line of decisions shows that Kentucky has judicially grafted Zolin and its evidentiary standards onto the crime-fraud exception now set forth in KRE 503(d)(1).  A litigant in Kentucky who desires to obtain discovery of information asserted to be protected by the attorney-client privilege, or some other privilege arising under Kentucky law, must first persuade the trial court by a preponderance of the evidence that the desired information either falls outside the scope of the privilege for one reason or another, or that an exception to the privilege exists.  Once this showing by a preponderance of the evidence is made, the trial court has the discretion to conduct an *in camera* review of the assertedly privileged materials to determine if such privilege exists or whether an exception justifies the removal of the privilege.

The showing required to conduct such *in camera* review is a lesser burden of proof than the showing required to overcome the privilege, however.  Accordingly, a litigant must show not only that a preponderance of evidence suggests that there may be crime or fraud sufficient to justify review of the documents as issue, but also that the communications contained in such documents were made in furtherance of the crime, fraud or tort so as to justify their disclosure.  In other words, the two-prong test used routinely throughout the Sixth Circuit in

23

Rainer, Collis and Antitrust Grand Jury applies with equal force in Kentucky.  This conclusion is applicable not only to situations involving the attorney-client privilege, but also to those instances when a party asserts the work product doctrine as a defense to disclosure.

c.        **Work Product Doctrine.**

The work product doctrine, or "work product privilege" as it is sometimes known, was first recognized by the United States Supreme Court in Hickman v. Taylor, 329 U.S. 495 (1974).  While the work product doctrine has some conceptual overlap with the attorney-client privilege, it "is distinct from and broader than the attorney-client privilege."  United States v. Nobles, 422 U.S. 25, 238 (1975); In re Antitrust Grand Jury, 805 F.2d at 163.  The attorney-client privilege operates to protect only confidential communications between an attorney and a client, while the work product doctrine exists to protect any document prepared by or for an attorney in anticipation of litigation.  In re Antitrust Grand Jury, 805 F.2d at 163 (citing In re Special September 1978 Grand Jury, 640 F.2d 49, 62 (7th Cir. 1980)).

The rationale of the doctrine, as explained in Hickman, 329 U.S. at 511, is to allow counsel to "assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference...."  See United States v. Roxworthy, 457 F.3d 590, 593-94 (6th Cir. 2006) (discussing Hickman).  The doctrine is currently incorporated in Fed.R.Civ.P. 26(b)(3) to protect from discovery those documents or tangible things prepared in anticipation of litigation by or for a party or the party's representative absent a showing by the party seeking production of substantial need and the unavailability of such information from another source.  Id.

At one time, the Sixth Circuit along with nearly all federal courts divided attorney work product into two categories: (1) ordinary fact or "unprivileged fact" work product, written or oral information transmitted to an attorney and recorded as conveyed by the client, which the courts held to be discoverable in certain instances, see In re Antitrust Grand Jury, 805 F.2d at 163; and (2) opinion work product, which the courts defined to be those materials reflecting an attorney's mental impressions, opinions, conclusions, judgments or legal theories.  As the Sixth Circuit recently noted in Regional Airport Authority of Louisville v. LFG, LLC, 460 F.3d 697, 713-17 (6th Cir. 2006), "Prior to 1993, there was general agreement that Federal Rule of Civil Procedure 26 excluded categorically the discovery of attorney opinion work product, even when provided to testifying experts."  Id. (citing Toledo Edison Co. v. GA Tech., Inc., 847 F.2d 335, 339-41 (6th Cir. 1988)). This view, however, was rejected by the Sixth Circuit in Regional Airport Authority of Louisville, which joined the majority of federal courts to hold that attorney opinion work product provided to a testifying expert is required to be disclosed under Rule 26. Accordingly, attorney opinion work product is not sacrosanct, as Magistrate Judge Dixon in Willits v. Peabody Coal Co., 1993 WL 35249 (W. D. Ky. Jan. 11, 1993) held *sub silencio* when he applied the crime-fraud exception to order the disclosure of attorney work product.

A party who asserts the protection of the work product doctrine, regardless of which category of work product is involved, must first establish that the documents that he or she seeks to protect were prepared "in anticipation of litigation."  Roxworthy, 457 F.3d at 594 (citing In re Powerhouse Licensing, LLC, 441 F.3d 467, 473 (6th Cir. 2006); Toledo Edison, 847 F.2d at 339).  The Sixth Circuit for the first time in Roxworthy wrestled with the definition of the doctrine's "in anticipation of litigation" requirement.  The Roxworthy opinion first noted that

25

other federal circuits had adopted the standard articulated in Wright & Miller's Federal Practice and Procedure, to ask whether a document was "prepared or obtained because of the prospect of litigation." Id. (collecting cases). This "because of" standard, which had been articulated in the Sixth Circuit previously in unpublished cases, was formally adopted in Roxworthy, 457 F.3d at 594 ("Today, we join our sister circuits and adopt the 'because of' test as the standard for determining whether documents were prepared 'in anticipation of litigation.'").

After adopting this standard, the Roxworthy decision continued to explain that, "Documents prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes, are not covered by the work product privilege." Id. (citing Fed.R.Civ.P. 26(b)(3)). Accordingly, "A document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation." Id. (citing United States v. Adlman, 134 F.3d 1194, 1205 (2nd Cir. 1998) (Adlman 2)).

Roxworthy's "because of" test to establish the "in anticipation of litigation" element of the work product doctrine has both an objective and a subjective component as the panel explains: "That is, a party must 'have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable.'" Id. (citing In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998)). Accordingly, when a party attempts to assert the work product doctrine as protection from disclosure, a federal court seated in the Sixth Circuit will ask first whether the document was created because of the party's subjective anticipation of litigation, in contrast with an ordinary business purpose; and second, whether that subjective anticipation of litigation was objectively reasonable under the circumstances. Id. (citing In re

26

ON Group Securities Litigation, 226 F.R.D. 579, 584-85 (N.D. Ohio 2005)); Guardsmark, Inc. v. Blue Cross and Blue Shield of Tennessee, 206 F.R.D. 202, 209-10 (W.D. Tenn. 2002)).

The Sixth Circuit in Roxworthy also addressed the manner in which a party may satisfy its burden of meeting the "because of" test.  The court held that a party may satisfy this burden "in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories."  Roxworthy, 457 F.3d at 596 (citing Toledo Edison, 847 F.2d at 339).  When a party provides a specific and detailed affidavit that indicates the contested documents were prepared because of a party's reasonable subjective belief of the possibility of litigation, then the party claiming work product protection will have satisfied its burden.  Id.  Federal courts in this circuit, however, will reject a claim of work product protection if the only basis for the claim is a party's conclusory allegations that a document has been prepared in anticipation of litigation.  Id. (citing Senate of P. R. ex rel. Judiciary Commission v. U.S. Dept. of Justice, 823 F.2d 574, 586 (D.C. Cir. 1987)).

Recently, in the decision In re Grand Jury Subpoenas, 454 F.3d 511, 519-20 (6th Cir. 2006), the Sixth Circuit recognized explicitly that both the attorney-client privilege and the work product doctrine are not absolute.  Either one "may be overridden, for instance, by the so-called crime-fraud exception, encompassing advice given with respect to ongoing or future wrongdoing."  Id. at 520.  The In re Grand Jury Subpoenas decision continued to observe that *in camera* review in accordance with the standard of Zolin is authorized by district judges to ascertain the applicability of the crime-fraud exception "only when the moving party has made a 'showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception

27

applies.'" Id. (citing Zolin, 491 U.S. at 572).  The court added that such private inspections by the district court "which do not destroy privilege, require a prior showing that is weakly analogous to probable cause."  Id.

### d.    *In Camera* **Review.**

The Court has now conducted an *in camera* review of the documents provided by both law firms involved in the representation of the Defendants.[9]  These documents were ordered produced by the Court by order entered on May 22, 2007 (DN 108, p. 1-2).  The Court specifically advised the parties in its order that its requirement for production of the subpoenaed documents "should not be misconstrued to suggest the Court's disposition" in the matter.  (Id.).  In effect, the Court concluded that the deposition excerpts of Deutsche employees Bart Grenier and Kevin Parker (DN 92, Exhs A and B) satisfied the minimal standard of proof established in Zolin and incorporated into the Steelvest and Stidham decisions.  In other words, the deposition excerpts provided by Invesco would suggest to a reasonable person that the possibility exists that review of the subpoenaed documents would potentially support Invesco's claim that the Global Partners breached their fiduciary duties to their employer.

For example, Grenier in his deposition conceded that it was "fair to say" that the Global Partners provided some of the names of Invesco employees in the WFI Group targeted as potential hires by Deutsche (DN 92, Exh. A, Grenier Depo. p. 15).  According to Grenier, the Global Partners also apparently were involved in providing information to identify the "12 key hiring positions" within the WFI Group (Id. at Grenier Depo. pp. 29-30).  Grenier also

---

[9] Attorney Sheller has no documents in his personal possession.

apparently discussed Invesco's Q Tech computerized investment management system with the Global Partners as part of their interview process (Id. at Grenier Depo. p. 55).  Finally, the Court considered that portion of Kevin Parker's deposition that indicated Global Partners Bowling and Guenther had discussed with Parker their concern that the technology resources of Invesco were being "drained away" and that the WFI specialized sales force "was being centralized and being taken away from them."  (DN 92, Parker Depo. at pp. 52-53).

These deposition excerpts would suggest to a reasonable person that the Global Partners may have revealed confidential information to Deutsche concerning perceived weaknesses in the organization of Invesco, details about its computerized investment management system, and the identity of Invesco employees within the WFI Group most suitable as potential hires by Deutsche.  The Court accordingly concluded that examination of the assertedly privileged communications was necessary to determine whether they were made in furtherance of some ongoing plan, facilitated by counsel, for the Global Partners to breach their fiduciary duties owed to Invesco, so as to implicate the crime-fraud exception to the attorney-client privilege.  As part of this review, the Court initially examined the documents to determine in the first instance whether they were relevant and, if so, were protected either by the attorney-client privilege or the work product doctrine.  After that, the Court then conducted a second review to focus on whether any otherwise protected document fell within the crime-fraud exception.

Examination of the documents provided has been time-consuming.  The sheer volume of the documents, over 1400 pages, has required the Court to expend substantial hours in its review.  There also has been the added complication that the documents come from two

sources and in certain instances involve communications between a number of counsel in related federal lawsuits in which the Global Partners and Deutsche share a common interest.  This cross-suit communication, if you will, has added to the number of senders and recipients that the Court must account for in its analysis.  Nevertheless, the Court has now completed its two-phase review and reaches the following conclusions.

      **1.**        **Unprivileged Documents.**

The Court at the outset notes that SKO has identified certain documents among its production of *in camera* review as being non-privileged.  These documents presumably have been provided to Invesco already.  For the most part, they appear to be the Global Partners' employment contracts with Deutsche.  The Bates number list compiled by the Court includes these documents with the "NP" designation signifying that they are not privileged.  It should be noted that the Bates number list prepared by the Court is **not** a privilege log. The parties, to the extent they have not done so already, are required by Rule 26(b)(5)(A) to prepare a privilege log for all otherwise discoverable information withheld upon a claim of privilege or work product protection.  See Fed.R.Civ.P. 26(b)(5)(A).  Such a log should be prepared and produced by the affected parties as soon as practicable to permit further review of this order by the District Court on objection, if for no other reason.

Examination of the remaining documents by the Court leads it to conclude that those documents that contain pre-litigation communications between the movants and Deutsche related to the negotiation of the Global Partners' terms of employment with Deutsche are *not* protected by any privilege or the work-product doctrine.  As counsel are aware, the Court has on

several prior occasions openly questioned whether documents transmitted by the movants to Deutsche or its counsel are protected from discovery.  Certainly, to the extent that such documents involve only the pre-litigation negotiation of Defendants' employment terms, they are not protected by either the attorney-client privilege or the attorney work product doctrine.

Such communications involve only business negotiations that would have occurred regardless of whether Invesco filed suit against the Global Partners in Kentucky or against Deutsche Bank in New York.  The communications between attorney Sheller and attorneys Brad Toborowski or John Lombardo of Deutsche, for example, that involve merely their ongoing negotiation of the provisions of the Global Partners' Deutsche contracts of employment are not documents generated "in anticipation of litigation" as that term has recently been defined in the Roxworthy decision.  See Roxworthy, 457 F.3d at 593-94, 597.[10]

The substance of such communications relates solely to the efforts of the partners and Deutsche Bank to craft mutually acceptable terms of employment.  These negotiations and the resulting employment contracts, perhaps while influenced indirectly by the prospect of litigation with Invesco, certainly did not occur "because of" the prospect of litigation.  The Court concludes that these pre-litigation electronic communications between attorney Sheller and Deutsche's attorneys over terms of employment and draft employment contracts they exchanged

---

[10]  The Court concludes that March 21, 2007, is the latest possible onset date for the "anticipation of litigation" requirement of the work product doctrine.  This date is the date on which the Global Partners signed their separate employment contracts with Deutsche.  E-mail communication between Toborowsky and Sheller confirms that Deutsche considered this date forward to be the onset date for the "anticipation of litigation" requirement for the purpose of contractual indemnification (Smith & Smith e-males Bates nos. 567-68).  The Court generally agrees with one exception that relates to an earlier e-mail exchange between the same two attorneys that the Court concludes is protected work product based on its content.  This earlier e-mail exchange is discussed in the text of the memorandum opinion.

would almost certainly have been prepared in "substantially the same manner irrespective of the anticipated litigation." Id. (citing Adlman III, 134 F.3d at 1205). Accordingly, the movants are required to produce this initial category of communications between attorney Sheller, any members of his former law firm, and Brad Toborowski or John Lombardo of Deutsche or any other Deutsche recipient, where the substance of such communications involves the pre-litigation negotiation of employment contract terms on behalf of the Defendant partners. This ruling applies as well to drafts of the employment contracts prepared by either Deutsche counsel or Sheller. No attorney-client privilege or work product protection attaches to these communications or to any business documents exchanged, *i.e.*, benefits plan summary or employment contract drafts. The movants' motion to quash is **DENIED** and Plaintiff's motion to compel is **GRANTED** to the extent of these documents. Movants shall produce this category of documents to Plaintiff on or before **Monday, June 11, 2007**. The affected documents are identified by Bates number accompanied by the "NP" designation in the Bates list accompanying this opinion.

## 2.   Privileged and Protected Documents.

In *camera* review of the other documents provided by the movants persuades the Court that all of the remaining documents each fall within one of several protected categories, absent application of the crime-fraud exception. The first of these groups of documents involves early pre-litigation communications between attorney Sheller and Deutsche counsel, Brad Toborowski or John Lombardo, in which the men exchange their professional views on possible claims that may arise from Deutsche's consideration of employing the Global Partners.

These electronic communications are not ordinary business communications. To the contrary, they would not exist but for counsel's anticipation of possible litigation with Invesco. These communications and their case law attachments, most of which were exchanged in November of 2006, in other words, were prepared "because of" the prospect of employment-related litigation. They therefore fall well within the protection of the attorney opinion work product doctrine. The exchange of views between Sheller and Deutsche's lawyers obviously has no impact on the application of the work product doctrine, which is not dependent upon confidentiality, unlike the attorney-client privilege. Absent the application of the crime-fraud exception, these relatively few early exchanges discussing various Kentucky cases and potential claims are protected from disclosure.

The next, related group of documents are those communications, and their attachments, exchanged between Sheller or his law firm, and Deutsche's counsel, primarily Brad Toborowski or John Lombardo, involving preparation for, or response to, the current federal or state litigation, including the suit originally filed by the Global Partners against Invesco in state court, or the federal action brought by Invesco against Deutsche in New York. This particular group of documents, most of which are e-mails and attached pleadings or motion papers, cannot in any sense be considered to have been prepared in the ordinary course of business. These exchanges between counsel were created solely because of their professional concern about the existence of impending or ongoing litigation involving Invesco, the Global Partners and Deutsche. In this regard, the Defendants and Deutsche shared a common legal interest to protect from related claims brought in separate but closely-related federal lawsuits arising from virtually the same facts.

33

Most of these communications occurred during late March of 2007, beginning not later than March 21, 2007, and going forward.  They contain the opinions, analysis and conclusions of counsel concerning the related claims and defenses in the above identified lawsuits.  As such, they are protected from disclosure under both the attorney work product doctrine, and the attorney-client privilege to the extent that the common interest or joint defense extensions of the attorney-client privilege apply.  See United States v. Moss, 9 F.3d 543, 550-51 (6th Cir. 1993) ("A joint defense extension of the attorney-client privilege has been applied to confidential communications shared between co-defendants which are 'part of an on-going and joint effort to set up a common defense strategy.'") (citing Haines v. Leggitt Group, Inc., 975 F.2d 81, 94 (3rd Cir. 1992).  See Broessel v. Triad Guar. Ins. Corp., 238 F.R.D. 215, 219 (W.D. Ky. 2006) (extensive discussion of the joint interest extension to the attorney-client privilege).

This leads the Court to the next group of protected documents, which conceptually is best viewed as being a subset of the above group.  This particular group of documents includes those communications between attorney Sheller and attorney Janet Jacubowitz (or her staff) at the law firm of Greenebaum, Doll & McDonald (GDM).  These communications, most which were shared with attorneys Toborowski or Lombardo, involve the action originally filed by the Global Partners in the Jefferson Circuit Court, which was subsequently removed to federal court.  The communications substantively involve the preparation of pleadings, or response to pleadings, in the partners own initial state lawsuit and the present litigation.  The communications are between counsel and include exchanges regarding the preparation and execution of a joint defense agreement by counsel for the Global Partners and Deutsche on or about March 27, 2007.

34

Clearly, these communications and their attachments were prepared in anticipation of, and in response to, ongoing litigation.  They fall easily within the scope of the attorney work product doctrine.  Once again, to the extent that the joint defense or interest extension of the attorney-client privilege applies, such communications between counsel are also protected by the attorney-client privilege, as well as the work product doctrine.  See gen. Travelers Cas. and Svr. Co. v. Excess Ins. Co. Ltd, 197 F.R.D. 601, 606-607 (S.D. Ohio 2000) (discussing both the joint defense and common interest rules).

The final protected group includes those confidential communications made directly between attorney Sheller and his clients, the four Defendant Global Partners and attorney Sheller's notes memorializing the same.  These communications are plainly protected by the attorney-client privilege absent the establishment of the crime-fraud exception.  They are confidential communications made by clients to Sheller for the purpose of obtaining legal advice.  They have not been shown to be disseminated outside the protected relationship so as to lose their confidential status.  Accordingly, they are not subject to production absent the application of KRE 503(d)(1).  Sheller's notes incorporating such communications obviously are protected attorney work product containing privileged communications.

**e.      Crime-Fraud Exception.**

The Court must now determine whether any of the protected documents identified above have lost their protected status by furthering an ongoing crime or fraud.  In the context of this case, the question is whether any particular document, upon review, can be shown to be connected to a breach of the Global Partner's contractual or common law fiduciary duties to

Invesco.  If a document can be shown to be connected to a breach of fiduciary duty, then the second prong of the two-prong test of <u>Zolin</u> applied in both the federal and Kentucky courts will be satisfied so that the protection of the attorney-client privilege or work product doctrine will be extinguished.  <u>See Stidham</u>, 74 S.W.3d at 726-27; <u>Kopowski</u>, 2005 WL 2045448 at *3.

The Court has diligently examined each of the many otherwise protected documents with an eye to determining whether the contents of a given document can be connected to a partner's breach of fiduciary duty.  It must be remembered that only those communications that further the alleged breach of fiduciary duty are subject to production under the exception.  It is not enough that a party has established a *prima facie* case sufficient merely to justify *in camera* review.  The requesting party must meet *both* prongs of the crime-fraud exception test in order to force production.  <u>Rainer</u>, 402 F.3d at 625; <u>In re Antitrust Grand Jury</u>, 805 F.2d at 164.

After many hours of examination, the Court simply cannot find any single document that appears connected to a breach of fiduciary duty.  On this important point, it must be kept in mind that merely seeking to obtain employment outside of Invesco is not, of itself, a breach of any duty.  Invesco has not argued, and cannot argue, that the Global Partners had any contractual or common law duty to maintain perpetual employment with Invesco.  They did not have such a duty.  Indeed, the very existence of the contractual notice provision at issue contemplates that they might, on some occasion in the future, seek to terminate their employment with Invesco.  Accordingly, documents that relate merely to the efforts of the Defendant partners to obtain employment elsewhere are not proof of any fiduciary violation absent some indication on the face of the documents that they are connected to the disclosure of

confidential or trade secret information.

None of the documents so appear to the Court. There is no mention of QTech to be found in *any* of the many documents examined by the Court. Likewise, the documents contain *no* names of any other Invesco employees of the WFI Group as potential hires by Deutsche. The documents contain *no* reference to any perceived weaknesses in the organizational or sales structure of Invesco. There is simply no reference whatsoever to any of these matters to be found in the written communications between counsel and client or between attorneys. Invesco has failed to meet the second prong of the two-prong analysis. It cannot, and has not, shown that any of the documents were made in furtherance of the alleged breaches of fiduciary duty pointed to by Invesco in the deposition excerpts of Grenier and Parker.

In many respects, this outcome is similar to what occurred in <u>Glidden Co. v. Jandernoa</u>, 173 F.R.D. 459, 481-82 (W.D. Mich. 1997), in which a plaintiff sought to obtain attorney-client privileged materials allegedly because they were connected with fraud and breach of fiduciary duty in relation to a management buyout of stock. The district court concluded, much like the present Court, that the documents at issue were not prepared to further any specific unlawful conduct. To quote the court in <u>Glidden</u>:

> It is not necessary to determine whether Grow has established probable cause on the merits of its fraud or breach of duty case, sufficient to invoke the crime/fraud exception, because Grow has essentially ignored the second essential element. Grow apparently assumes that a plaintiff may have full discovery of all attorney-client communications between defendants and counsel in any case where a plaintiff's fraud allegations are colorable. This is not the law. The attorney-client privilege is not vitiated merely because a client is alleged to have committed an unlawful or fraudulent act; there also must be a prima facie showing that the confidential communication was involved in the preparation or furtherance of the specific unlawful conduct. <u>Burlington Inuds. v. Exxon Corp.</u>,

37

65 F.R.D. 26, 40 (D. Md. 1974); see Hercules, Inc. v. Exxon Corp., 434 F. Supp. 136, 155 (D. Del. 1977).  "[M]erely because some communications may be related to a crime is not enough to subject that communication to disclosure; the communication must have been made with an intent to further the crime."  In re Antitrust Grand Jury, 805 F.2d at 167.  Although plaintiff need not show that the lawyer knew of or was complicit in the client's unlawful purpose, see Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469-70, 77 L.Ed. 993 (1933); United States v. Sudan, 812 F.2d 920, 926 (5th Cir. 1986), plaintiff must establish that the communications with counsel were intended in some way to facilitate criminal or fraudulent activity.  Where there is no satisfactory showing that the communications were made in furtherance of the fraud, it is unnecessary to decide whether a prima facie case of fraud has been shown.  Hercules, 434 F. Supp. at 155; Matter of Sutton, 1996 WL 659002, at *9-10; accord, Johnson Electric North America, Inc. v. Mabuchi North America Corp., NO. 88 CIV 7377 (JES), 1996 WL 191590 (S.D.N.Y. April 19, 1996).

....

Grow is thereby treating the entire stock purchase transaction as if it were one massive fraud or beach of duty.  The law does not sanction so sweeping an application of the crime/fraud exception.  See Ward v. Succession of Freeman, 854 F.2d 780, 790 (5th Cir. 1988).  A management buyout is not a fraud or crime.  Rather, the wrongdoing (if any there was) would consist in the alleged nondisclosures and misstatements upon which Grow claims to have relief.  Grow has made no prima facie showing that any of the attorney-client materials furthered the alleged wrongful conduct.  In fact, the only evidence before court is to the contrary.

Glidden, 173 F.R.D. at 481-82.  See also Royal Surplus Lines Ins. Co. v. Sofamor Danek Group, 190 F.R.D. 505, 513 (W.D. Tenn. 1999) (absent nexus between document and fraud the second prong of crime-fraud exception was not met).

Similar to Glidden, the mere efforts of a Global Partner to obtain employment with another employer are not, per se, an unlawful act or a breach of fiduciary duty.  Merely because many of the documents relate to the efforts of the Global Partners to seek employment

38

with Deutsche does not establish their connection to any contractual or common law breach of

fiduciary duty.  In the absence of any reference to the type of supposed disclosures of

confidential information contained in the deposition excerpts, or any other information

suggesting a breach of fiduciary duty, the Court concludes that Invesco has failed to show that

the crime-fraud exception of KRE 503(d)(1) applies to make any of the protected documents

discoverable.  To this extent, the Court **GRANTS** the motion to quash and **DENIES** Plaintiff's

motion to compel as to all documents except those previously found to be non-privileged.


**e.      Deposition of Attorney Sheller.**

The final issue to be considered turns on the subpoena served upon attorney

Sheller to obtain his deposition.  Sheller, who has retained separate counsel to represent him, has

filed a motion to quash the deposition subpoena.  Invesco has filed a response to the motion.

Whether Sheller may be properly deposed is governed by the standard set forth in Shelton v.

American Motors Corp., 805 F.2d 1323 (8th Cir. 1986), which was adopted by the Sixth Circuit

in Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621, 628 (6th Cir. 2002).  See also

Ellipsis, Inc. v. Colorworks, Inc., 227 F.R.D. 496, 497-98 (W.D. Tenn. 2005).

The Court notes at the outset of its analysis that the Federal Rules of Civil

Procedure do not specifically prohibit a party from taking the deposition of an opposing counsel.

Rule 30(a) of the Federal Rules of Federal Procedure provides that a party may take the

deposition of "any person."  See FMC Technologies, Inc. v. Edwards, 207 WL 836709 at *2

(W.D. Wash. March 17, 2007) ("In general, depositions may be conducted of 'any person';

attorneys are not generally exempt.")  A party who seeks to take the deposition of an opposing

counsel, however, bears the burden to show the propriety of and need for deposing the attorney of his opponent.  Shelton, 805 F.2d at 1527; American Casualty Co. v. Kreiger, 160 F.R.D. 582, 588 (S.D. Cal. 1995).

To say that the federal courts discourage the taking of an opposing counsel's deposition is to put the matter rather mildly.  To quote from Shelton, deposing an opposing counsel "disrupts the adversarial system and lowers the standards of the profession ... it also adds to the already burdensome time and cost of litigation."  Shelton, 805 F.2d at 1327; Theriot v. Parish of Jefferson, 185 F.3d 477, 491 (5th Cir. 1999) ("Generally, federal courts have disfavored the practice of taking the deposition of a party's attorney; instead, the practice should be employed only in limited circumstances.") (citing Shelton, 805 F.2d at 1327).

In Shelton, the Eighth Circuit set forth a three-part test that must be met by a party who seeks to depose the attorney of an opponent.  Under the test, the party must show that "(1) no other means exists to obtain the information than to depose opposing counsel, (2) the information sought is relevant and non-privileged, and (3) the information is crucial to the preparation of the case.  See Padima, Inc. v. E.S.Originals, Inc., 281 F.3d 726, 729-30 (8th Cir. 2002) (discussing the three-part Shelton test).  The Shelton test has been described as placing "a difficult burden" on a party who seeks to depose opposing counsel so as to "guard against the 'harassing practice of deposing opposing counsel....'"  Padima, 281 F.3d at 729-30.

To obtain the deposition of opposing counsel, a party must meet all three of the elements of the test, for "even when a party meets two of the Shelton factors by showing the information sought is non-privileged and crucial, that party's failure to establish that the attorney deposition is the only reasonably practicable means available for obtaining the information will

40

still defeat an attempt to depose opposing counsel." Simmons Foods, Inc. v. Willis, 191 F.R.D.

625, 630-31 (D. Kan. 2000).  The Shelton test, therefore, has been erected "as a barrier to protect

trial attorneys from these depositions."  See Desert Orchid Partners, LLC v. Transaction Systems

Architects, Inc., 237 F.R.D. 215, 217-20 (D. Neb. 2006).

       Nothing in the motion papers related to Invesco's attempt to depose attorney

Sheller convinces the Court that the difficult Shelton barrier has been surmounted by Invesco.

Sheller possesses no relevant and non-privileged information that cannot be obtained from the

Global Partners themselves or from the employees of Deutsche Bank.  As noted, the Court has

already determined that much, if not all, of the communications provided for *in camera* review

are protected either by the attorney-client privilege or the attorney work product doctrine.  The

remaining communications, essentially business negotiations over the terms of the partners'

employment contracts, are exactly the type of information that the partners or Deutsche

employees are best situated to testify concerning.

       Finally, it is doubtful that this type of information, although perhaps relevant, is

"crucial" to Invesco's preparation in this case.  Certainly, such information is discoverable from

the partners.  No overwhelming need has been shown that would justify taking the deposition of

attorney Sheller.  Accordingly, the motion to quash the subpoena for Sheller's deposition is

**GRANTED**.  Invesco may look to the Global Partners or Deutsche employees to obtain

information concerning the employment contract terms or negotiations involving the Global

Partners.

       Attached to the memorandum opinion is a list of Bates numbers that corresponds

to all the various documents provided by SKO and Smith & Smith.  Adjacent to the affected

Bates number is a designation of the document's privileged or non-privileged status as determined by the Court in accordance with the rulings contained in this opinion.  This list is not a privilege log.  Further, its document designations are subject to review by the District Court, as is any aspect of this order, upon timely objection by either Plaintiff or Defendants pursuant to Rule 72(a) of the Federal Rules of Civil Procedure.

Copies to Counsel of Record