UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:07CV-175-R

INVESCO INSTITUTIONAL (N.A.), INC.                    PLAINTIFF

v.

STEPHEN M. JOHNSON, et al.                    DEFENDANTS


**MEMORANDUM OPINION**

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Docket #31).  The parties filed simultaneous briefs on the motion on May 29, 2007 (Docket #129, 130).  In their brief, Defendants also made a Motion for Preliminary Injunction (Docket #129) to enjoin INVESCO from enforcing the notice period.  Defendants filed a reply (Docket #141) and a supplement to that reply (Docket #155).  A hearing on the matter was held on June 13, 2007.  This matter is now ripe for adjudication.  For the reasons that follow Plaintiff's Motion for Preliminary Injunction is GRANTED IN PART and Defendants' Motion for Preliminary Injunction is GRANTED IN PART.

**BACKGROUND**

In the early 1990's, Plaintiff INVESCO recruited Defendants Stephen M. Jonhson, James F. Guenther,  Kenneth R. Bowling, and Randy G. Paas to work in its Louisville, Kentucky operation as part of INVESECO's Fixed Income/Stable Value Division.  During their employment, each Defendant rose to the level of Global Partner, a term used throughout the AMVESCAP Group, the ultimate corporate parent of INVESCO, to refer to the most senior group of officers and employees. In January of 2001, each Defendant executed a Global Partner Agreement ("GPA"), governing the

terms and conditions of their employment.

Section 3.A of the GPA contains a notice provision that requires the Global Partners to provide INVESCO with twelve month's written notice of the Partner's intention to terminate his employment relationship with INVESCO (and vice versa).[1]  Employment would continue for the entire notice period.  If the termination was for cause, as defined under Section 3.C of the GPA, no notice period was required.  Pursuant to Section 3.C of the GPA, a Global Partner may terminate their employment immediately if INVESCO, after written notice, has engaged in any continuing violation of the GPA and has not cured the violation within a reasonable time.

Starting in the summer of 2006, Deutsche Investment Management Americas, Inc., an INVESCO competitor, initiated an effort to hire away Defendants as well as other key members of INVESCO's Worldwide Fixed Income ("WFI") group in Louisville.

On August 30, 2006, Defendant Bowling was approached by Munir Dauhajre, a Deutsche employee, regarding Defendant Bowling's interest in meeting Kevin Parker, head of all global asset management business at Deutsche's parent company, Deutsche Bank.  Defendant Bowling provided Dauhajre with general information concerning INVESCO via email and indicated that he and his "colleagues" planned on being in New York City on September 18th and 19th and would like to have further detailed discussions face-to-face.[2]  The email provided the following information:

---

[1]  A note to Section 3.A of the GPA states: "INVESCO is willing to agree to a minimum four month notice period, but will accept up to twelve months as a reasonable notice period. Please fill in and initial the notice period that you desire.  If you do not designate a number of months in the blank or if you designate a number less than four months, you are agreeing to the default notice period of four months."   Each Defendant chose a notice period of twelve months.

[2]  Defendant Bowling stated in his email that he "wanted to pass on some general information, but wanted to keep such information contained to the 'public' domain."  Defendant Bowling indicated that the information concerning INVESCO in the email was far less

2

Total fixed income AUM [assets under management] = ~90 Bln . . .  Total Investment Staff: 55 (this every current fixed income investment person per our org chart.  Total staff needed to operate is much less than this).

Of the 90 Bln, 45 Bln is large Defined Contribution clients.  6 Relationship managers control these accounts out of Louisville (these folks are included as interested parties).

. . .

8 High Yield and EM folks in the NYC office (again included . . . )

12 folks in London - FX and Non-us rates (again included . . . )

. . .

Entire investment architecture designed and specified by 5 senior investment folks to 5 application development resources (also interested).

. . .

Entire growth of Assets and products in our fixed income has been done organically through existing clients and sales by senior investment folks.

Defendant Bowling arranged for a meeting among Parker and Defendants Bowling and Guenther on September 11, 2006.  The day after their meeting, Defendants Bowling and Guenther reported on the meeting to Defendant Johnson, their direct manager at INVESCO.  At some point after this meeting, Defendant Bowling received a telephone call from Parker in which he explained that Deutsche was lacking an institutional fixed income component.  Defendant Bowling discussed this conversation with Defendants Johnson and Paas.  Parker called Defendant Bowling in early October telling him that he was very interested in filling the "hole" Deutsche had in institutional fixed income.

Over the next two months, Defendants had several meetings with Deutsche representatives

---

information than he and Dauhajre had discussed.

in Louisville and New York.  On November 2, 2006, Defendants Bowling, Johnson, and Guenther had dinner in Louisville with Parker and Bart Grenier to discuss the Deutsche opportunity.  Grenier ran Deutsche's fixed income business.  At the dinner, Parker expressed his interest in hiring people for a new Deutsche institutional investment unit.  Following the dinner, Defendants Bowling and Paas discussed the dinner conversation over the telephone.  Days later, Mark Cullen, a senior Deutsche executive, phoned each of the Defendants to schedule meetings in New York City with a broad group of people at Deutsche's investment management group.  On November 6, 2007, Deutsche organized a high-level internal meeting to kick off "Project Daniel Boone," a project to review and understand the viability, feasibility, and financial implication of hiring a group out of INVESCO.

On November 9, 2006, the day before the scheduled meeting, Jonathan Goldberg, a lawyer representing Defendants, faxed Bowling's GPA to Brad Toborowsky, a Deutsche lawyer.  On November 10, 2006, Defendants Bowling, Johnson, and Paas traveled from Louisville to New York for their interviews at the St. Regis hotel where they overnighted as guests of Deutsche.  Each first met with Cullen who established ground rules for the day: the Defendants were not to discuss anything regarding INVESCO/AMVESCAP and were instructed to bring nothing to the interview and take nothing from the interview.  The Defendants then met with Deutsche human resources representatives to discuss their compensation expectations and the contractual requirements under their GPAs.  Defendants then met for several hours with a group of Deutsche executives.  Defendants and Deutsche discussed the anticipated and desired consequences of the departure of Defendants from INVESCO.

Based in part of information gleaned during the November 10, 2006 meetings at the St.

Regis, Deutsche prepared an internal discussion document entitled "Deutsche Asset Management - Project Daniel Boone." This document reveals that Deutsche's intention was to rapidly build up its US Fixed Income Investment Platform through aggressive hiring of external talent. The scheme was to first hire a number of senior professionals from the market to take the lead in business buildup, envisaged to include four professionals in the United States and one in the United Kingdom. This portion of the scheme was named the "First Wave." The "Second Wave" of the plan consisted of Deutsche hiring a number of professionals from the market to fill the key roles of the Fixed Income Institutional Platform, envisaged to include a total of twelve additional professionals. Lastly, in the "Third Wave," Deutsche would hire junior professionals from the market. The document indicated that the five top positions had been identified and were expected to join Deutsche within four months of resigning from their current positions.

By mid-November, Defendants had fired Goldberg as their lawyer and Defendants Bowling, Guenther, and Paas had retained their current counsel, John Sheller. On November 20, 2006, Sheller emailed Toborowsky, outlining the strategy for the simultaneous submission of Defendants' notices. Sheller writes that once the terms of the Defendants separation from INVESCO were worked out, "the ground work should have been laid for an acquisition of [INVESCO] by [Deutsche] if that is what you contemplate." Sheller also addressed Deutsche's recruitment of other INVESCO employees:

> In the meantime, of course, [Deutsche] would be free to recruit other employees of [INVESCO] who are who are not now under contract. This might be done best with a headhunter rather than by direct contact. We believe that as soon as the notices of termination are served, [INVESCO] will begin circling the wagons to impede this recruitment, such as by putting the others under contract while increasing their compensation.

The following day, Deutsche engaged Russell Reynolds Associates, Inc. ("RRA"), an executive

recruiting firm, to being targeting the Second Wave employees.

As negotiations with Defendants progressed, Deutsche's Project Daniel Boone team worked on detailed financial projections. Grenier, who headed the Project Daniel Boone team, stated that Deutsche shared its financial projections for the new business with one or more of the defendants, and that they provided feedback to Deutsche on financial assumptions. Copies of early documents of these financial assumptions produced by Deutsche confirm that Defendants had input regarding the viability of various scenarios.

The efforts of the Project Daniel Boone team culminated in a planning document dated January 9, 2007, and entitled "Project Daniel Boone: Financial Assumptions." The document contained a detailed schematic of five different scenarios that covered the full range of possibilities for the business that Deutsche wished to acquire. Scenario four, referred to as a business coup, was indicated as Deutsche's best position.

In late January 2007, Defendants received oral offers of employment from Deutsche, which were later confirmed in writing. These written offer letters included an indemnification clause. Defendants accepted these offers and orally committed to resigning their employment with INVESCO.

On January 22, 2007, RRA and Deutsche entered into a second engagement letter that specified the nine Second Wave positions that needed to be filled. Grenier admitted that Defendants provided Deutsche with the names of INVESCO employees to fill some of the Second Wave positions.

On March 7, 2007, following interviews in Louisville, Deutsche extended offers to the Second Wave candidates. No offers were made to non-INVESCO candidates. An RRA document

6

reveals that all candidates would resign on March 26, 2007.  The candidates were told to sign the offer letters and put them in their desk drawers at home until the trigger date.

INVESCO management learned that the core of the WFI group was about to defect on March 23, 2007.  On March 26, 2007, the Defendants orally informed Martin Flanagan, Chief Executive Officer of AMVESCAP PLC, that they were resigning from INVESCO to join Deutsche.  The Defendants subsequently tendered written notice of termination as called for under the GPA.  The Second Wave resignations also occurred on March 26, resulting in the resignations of nine members of the WFI group not under written employment agreements.  Eight additional INVESCO employees later resigned.

On March 27, 2007, Defendant Paas was terminated for cause.  Defendants Johnson, Guenther, and Bowling ("Employed Defendants") were placed on leave of absence with pay for two weeks.  That leave was extended at the end of the two week period pending further uncovering of the facts and deliberation.  INVESCO indicates that the Employed Defendants were paid their regular salaries and received their regular benefits while on leave.  INVESCO intends to provide the Employed Defendants a bonus for 2007 consistent with what they earned in 2006, assuming that they remain as employees of INVESCO through the applicable payment date of February 28, 2007, in accordance with INVESCO's standard policy with respect to the payment of annual bonuses.[3] Stock options and restricted stock awards that have been made to the Employed Defendants will continue to vest so long as their employment continues through the relevant vesting dates, in

---

[3] The Employed Defendants receive most of their cash compensation by way of a bonus paid after the end of the year.  For example, in 2006, Defendant Johnson received a regular salary of approximately $300,000 during the year and a bonus of approximately $700,000 paid in February 2007 based on 2006 performance.

accordance with and subject to the terms of the applicable plans.

The complaint in the instant action was filed on March 27, 2007 against Defendant Paas. The complaint was amended on March 28, 2007 to include all Defendants. The amended complaint contains four counts: breach of contract, trade secret violation, inevitable disclosure, breach of duty, unfair competition, conspiracy, and injunctive relief.

By letter dated April 17, 2007, counsel for the Employed Defendants notified counsel for INVESCO that the treatment of the Employed Defendants was in clear contravention of the terms of the GPA. Specifically, defense counsel stated:

> [P]lease consider this letter to be notice of a declaration of Invesco's material breach of the Global Partner Agreements of Messrs. Johnson, Guenther and Bowling under Paragraph 3.C. of their respective agreements. Of course, Invesco was on notice of the material breach prior to this time through individual communications from my clients, as well as their suit filed on March 28.
>
> As a result of Invesco's conduct in placing my clients upon involuntary leave of absence, denying them access to company premises, computers and other resources, denying them access to clients, subordinates, superiors, and other personnel of Invesco, and rendering them incapable of carrying out their job responsibilities, Invesco is engaged in continuing violations of the agreements. Invesco is hereby placed upon notice and demand to cure the violations post haste and, in any event, no later than April 30, 2007.

On April 20, 2007, INVESCO filed a motion for preliminary injunction seeking, in part, to require the Employed Defendants to honor the twelve month notice of termination provision set forth in the GPA and refrain from competitive activity while serving out the notice period. That same day, this Court entered an order scheduling a hearing on INVESCO's motion for preliminary injunction.

By letter dated April 27, 2007, counsel for INVESCO notified counsel for the Employed Defendants that the Employed Defendants would be returned to active employment on May 21,

8

2007.  The letter also directed the Employed Defendants to be in INVESCO's offices in Atlanta, on INVESCO's expense, on April 30, 2007, to discuss matters pertaining to their impending return to work.  The Employed Defendants did not appear in INVESCO's offices on that date.

The Employed Defendants notified INVESCO by letter that they had terminated their GPAs effective April 30, 2007.

Following a hearing on May 6, 2007, this Court granted INVESCO's Motion for Temporary Restraining Order, finding that, for purposes of the motion, INVESCO had breached the GPA when it placed the Employed Defendants on administrative leave but had not yet been given an opportunity to cure.  This Court ordered INVESCO to continue to pay the Employed Defendants their current salaries and benefits and maintain their eligibility for bonuses and stock options and restricted stock awards until the order on the motion for preliminary injunction issues.  Additionally this Court required INVESCO to provide the Employed Defendants with the terms of their reinstatement no later than May 21, 2007.

On May 21, 2007, INVESCO provided descriptions of the Employed Defendants duties upon reinstatement by letter.  On May 30, 2007, the Employed Defendants were returned to active employment.  The Employed Defendants were removed from the trading floor on the 33rd floor and put together in an office on the 22nd floor.  The Employed Defendants were told that any communications to staff must be through Karen Dunn Kelly, who took control of the INVESCO WFI Group following the Defendant's notice.  The Employed Defendants were to have no communications with consultants or clients.

## STANDARD

In determining whether to issue a preliminary injunction, the court must consider: "(1)

9

whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Summit County Democratic Cent. & Executive Comm. v. Blackwell*, 388 F.3d 547, 550-51 (6th Cir. 2004) (quoting *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

## ANALYSIS

## I.     LIKELIHOOD OF SUCCESS ON THE MERITS

## A.     Breach of Fiduciary Duty

INVESCO argues that Defendants have violated their common law and contractual fiduciary duties owed to INVESCO and will continue to do so should they be permitted to begin or continue working for Deutsche.  INVESCO asks that the Defendants be enjoined from working for Deutsche or continuing to work for Deutsche while employed by INVESCO and for at least six months thereafter.

Under Kentucky law, a fiduciary relationship exists where a relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 7115 (6th Cir. 2005) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)).  As Global Partners,

Defendants were given substantial oversight and control over INVESCO's business operations as well as access to INVESCO's confidential information.  For purposes of this motion, the Court finds that Defendants owed INVESCO common law fiduciary duties under Kentucky law.

Defendants also owe contractual fiduciary duties to INVESCO.  The GPA obligates Defendants as follows:

> As a Global Partner you have important duties to [INVESCO]: the duty to refrain from dealing in your self interest above that of [INVESCO's], the duty to disclose any information that indicates that you may be exposed to a conflict of interests, the duty of loyalty, and the duty to refrain from using [INVESCO's] business opportunities for your own benefit.  These fiduciary obligations and others arise because of the unique trust and confidence [INVESCO] places in you as a Global Partner.

Where a fiduciary relationship exists, the fiduciary is obligated to remain "loyal and faithful" to the principal's interest, and cannot "lawfully serve or acquire any private interest of his own in opposition to it."  *Stewart v. Ky. Paving Co.*, 557 S.W.2d 435, 438 (Ky. 1977) (quoting *Hoge v. Ky. River Coal Corp.*, 287 S.W. 226, 227 (1926)).  Whenever a fiduciary possesses information and the withholding of that information will damage the corporation, it is his duty to fully disclose these facts to the corporation.  *Aero Drapery of Ky., Inc. v. Engdahl*, 507 S.W.2d 166, 169 (Ky. Ct. App. 1974).  A fiduciary may not, while still a fiduciary, resign and take with him the key personnel of the corporation for the purpose of operating a competitive enterprise.  *Id.*

The Court finds that for purposes of the present motion, it is more likely than not that Defendants breached their common law and contractual fiduciary duties to INVESCO.[4]  There is substantial evidence that Defendants did not remain loyal to INVESCO, but instead colluded with

---

[4]  Having found that there is a strong likelihood that INVESCO will succeed on its breach of contract claim with regards to the fiduciary duty covenant, this Court will not address INVESCO's arguments as to breach of the other covenants.

11

Deutsche, an INVESCO competitor, in organizing the March 26, 2007 resignations, a move calculated to cripple INVESCO's WFI operation.  There is evidence that Defendants indicated to Deutsche which INVESCO employees should be hired to assume key roles at Deutsche.  Defendants failed to disclose to INVESCO any information concerning this long-planned defection.

**B.      Inevitable Disclosure**

INVESCO claims that Defendants should be prevented from working for Deutsche under the doctrine of inevitable disclosure.  This doctrine permits a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."  *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).  INVESCO claims that the Employed Defendants' plans to begin working for Deutsche and Defendant Paas' actual employment with Deutsche create a serious risk that Defendants will, by necessity, disclose INVESCO's trade secret and confidential business information to their new employer, thereby violating the Kentucky Trade Secrets Act and the non-disclosure covenants in their GPAs.  INVESCO claims that it is entitled to an injunction prohibiting Defendants from working for Deutsche while employed by INVESCO and for at least the six-month duration of their non-disclosure covenants.

The doctrine of inevitable disclosure has not been approved by any Kentucky court or the Sixth Circuit.  "[F]ederal courts sitting in a diversity case are in a particularly poor position . . . to endorse [a] fundamental policy innovation . . . Absent some authoritative signal from the legislature of the courts of [the state], we see no basis for even considering the pros and cons of innovative theories" *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577-78 (6th Cir. 2004) (internal citations omitted).  Here, there is no indication from the Kentucky legislature that such a doctrine would be improved.

12

Therefore, this Court finds that INVESCO does not have a strong likelihood of succeeding on the merits of its inevitable disclosure claim.

**C.      Breach of Contract**

The Employed Defendants argue that INVESCO breached the GPA when it placed the Employed Defendants on involuntary indefinite leaves of absence and that INVESCO's return of the Employed Defendants to work has failed to adequately cure this breach.

The Employed Defendants rely primarily on a case from the Colorado Court of Appeals. The issue before the court in *Montemayor v. Jacor Communications, Inc.*, was whether the plaintiff employee had established a *prima facie* case of breach of contract that supported the jury's verdict in her favor. 64 P.3d 916, 920 (Colo. Ct. App. 2003). Plaintiff, an employee of defendant company, had entered into an Executive Employment and Non Competition Agreement that provided that she was to act as a senior executive officer of defendant for a period of two years or until she was discharged for cause or disability, or until she terminated the agreement for "good reason" which included leaving within six months of "any material reduction in the scope of [her] duties and responsibilities for the Company from those duties undertaken by [her] for the Company on the date of this Agreement." *Id.* at 919. Pursuant to the agreement, plaintiff was to be consulted on all "major strategic decisions" concerning the company. *Id.* Following her complaint of harassing behavior from a co-worker, the company's general manager informed plaintiff that she was no longer president of the company, that management had eliminated her authority to make any decisions, that no employees would report to or work for her, and that her job duties were limited to acting as a resource and consultant to sales staff. *Id.* at 919-20. Plaintiff then terminated the agreement citing "good reason," and filed an action claiming interference with contract, breach of

13

contract, conspiracy, and a violation of the Colorado Wage Claim Act.  *Id.* at 920.

The Colorado Court of Appeals found that "[w]hen the anticipated nonmonetary benefits to the employee are a material part of the advantage to be received from employment, an employment contract has an implied promise to provide work." *Id.* at 920-21.  The court stated that these benefits "may be among other things, the acquisition of skill or reputation by the employee, or the opportunity to earn performance bonuses." *Id.*  The court also determined that "plaintiff's demotion from president to sales consultant, which stripped her of all decision-making and managerial responsibilities, and which the parties did not contemplate when they agreed that she would act as an executive, constituted a breach of contract." *Id.* at 921.

INVESCO argues that *Montemayor* is inapplicable here as there is no Kentucky authority to support implying any term into the contract at bar.  "An implied covenant is one which may reasonably be inferred from the whole agreement and circumstances attending its execution." *Anderson v. Britt*, 375 S.W.2d 258, 260 (Ky. Ct. App. 1963).  The courts have refused to prescribe a certain form for the construction of an implied covenant, instead looking to the true intentions of the parties. *Id*.  The law does not favor implied covenants, but this general rule does not mean that covenants may never be implied from written agreements.  *Lagrew v. Hooks-SupeRx, Inc.*, 905 F. Supp. 401, 405 (E.D. Ky. 1995).  "The courts will declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made." *Anderson*, 375 S.W.2d at 261.

The GPA states that the agreement is for employment as a Global Partner.  The term Global Partner is defined in the GPA as a term "used throughout the AMVESCAP Group to refer to the

most senior group of officers and employees."  Under the Section entitled "Duties of Employment" the GPA states, "You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter.  The attachment may be modified in the future if you and the Company agree in writing."  Each GPA contains an attachment which includes a statement of responsibilities.  Defendant Johnson's statement of responsibilities reads "Fixed Income Chief Investment Dealer," Defendant Guenther's reads "Oversight and direction of fixed income credit research team/process," and Defendant Bowling's reads "Development of product strategy."

This Court finds that it could reasonably be inferred from the GPA and the circumstances attending its execution that the GPA contained an implied covenant that INVESCO would provide the Employed Defendants with work of a senior executive or with the duties of a Global Partner. A large part of the Employed Defendant's yearly salary consists of their performance based bonus. Section 2 of the GPA states that in addition to the annual salary, the Global Partner will "receive certain bonuses and stock awards as approved from time to time by the Company."  Although INVESCO has stated that it will provide the Employed Defendants with a bonus for 2007 consistent with what they earned in 2006, assuming that they remain employees of INVESCO through February 28, 2007, this guarantee was not in effect at the time the parties entered into the GPA.  At the time the parties entered the GPA, the bonus was based on the employee's performance on work supplied by INVESCO.  Although it is a close question, the Court assumes that for the purposes of this motion at this time that having failed to provide the Employed Defendants with work, INVESCO breached the GPA.  *See Montemayor*, 64 P.3d at 920-21.  This conclusion is not affected by the fact that the Employed Defendants had given their notice of termination to INVESCO prior to being placed on leave.  Pursuant to Section 3.C of the GPA, during the notice period prior to

15

termination, the Global Partner's employment was to continue for the entire notice period. There is no indication in the GPA that this employment would differ in any material way from the employment prior to the notice of termination.

This Court's conclusion is bolstered by the result in a Tennessee Supreme Court case *Guiliano v. Cleo, Inc.* The plaintiff in *Guiliano* had been employed as a director of marketing at defendant company for one year when he entered into a written employment contract with the company. 995 S.W.2d 88, 91-92 (Tenn. 1999). Following a management change at the company, plaintiff's employment responsibilities were diminished. *Id.* at 92-93. Plaintiff received a letter from the company's President and Chief Executive Officer stating that he was relieved of his duties as Vice President of Marketing and shall be responsible for such assignments as may be given to him by the company's President until the expiration of his employment contract and would remain at his current salary. *Id.* at 93. The letter stated that plaintiff would be based out of his home for all future assignments. *Id.* Subsequently, plaintiff received letters from the company indicating that he was no longer authorized to use company credit cards and that the company would no longer answer a telephone line for him. *Id.* All telephone calls for the plaintiff were to be screened for personal or business, with the personal calls being directed to plaintiff's home. *Id.* Plaintiff stayed at his home for three months without receiving a work assignment from the company. *Id.* In the meantime, a co-worker moved into plaintiff's old office and assumed the marketing responsibilities previously handled by the Plaintiff. *Id.* The plaintiff subsequently filed suit against the company, claiming that the company had constructively terminated his employment without cause. *Id.*

Addressing the issue as strictly one of breach of contract, the Tennessee Supreme Court held that the company had terminated plaintiff's employment without cause, thereby breaching the

16

contract.  *Id.* at 94.  The court held that although the contract enabled the company to change plaintiff's job functions and responsibilities during the course of the contract, this did not include the right to remove all of plaintiff's duties.  *Id.* at 95.  In so holding, the court specifically rejected the company's contention that it had fulfilled its contractual obligation to plaintiff by keeping him on the company payroll at his then current salary although it had altered and effectively ended his work responsibilities.  *Id.* at 95-96.

INVESCO cites to a decision by the District Court of the Southern District of New York in support of its position.  In *Natsource LLC v. Paribello*, Paribello, an energy commodities broker was employed by Natsource pursuant to an employment agreement which provided, among either things, that either party could terminate the contract for any reason, but only after providing thirty days written notice of termination.  151 F. Supp. 2d 465, 466 (S.D.N.Y 2001).  After Natsource learned that Paribello intended to resign and accept a position with a Natsource competitor and subsequently confronted him with the information, Portibello resigned.  *Id.* at 467.  Portibello reported to work at Natsource the day after his resignation where he was told to take the day off and that he would be contacted regarding his employment status.  *Id.*  After Paribello's attorney sent the company a letter purporting to provide the thirty days written notice required by the employment agreement, Natsource sent Paribello a letter instructing him not to report to Natsource's premises.  *Id.* at 468.  Paribellos' attorney responded with a letter stating that "by directing Paribello to cease any brokering activity and leave the trading floor that morning, Natsource terminated Paribello without notice or cause, in violation of the employment agreement."  *Id.*  After issuing a temporary restraining order enjoining Paribello from  violating the restrictive covenants in his employment agreement, the court considered whether to grant a preliminary injunction enforcing the covenants.

17

*Id.*  Paribello argued that Natsource had materially breached the agreement by preventing him from working at Natsource after he gave his notice.  *Id.* at 476-77.  The contractual provision at issue stated: "Employee shall be employed to broker over the counter energy-related and environment-related instruments, with such duties and powers as shall be reasonably determined, from time to time, by Employer."  *Id.* at 477.  The court interpreted this provision as providing Natsource the sole discretion to assign Paribello his specific duties as it reasonably determined appropriate, although Paribellow was hired for the purpose of providing brokering services.  *Id.*  The court found that Natsource reasonably determined that Paribello should spend his thirty day notice period on paid leave rather than in the office on the trading floor, given the circumstances surrounding Paribello's termination.  *Id.*

However, in the instant case INVESCO does not retain the discretion to assign the Employed Defendants their specific duties.  The GPA states in pertinent part: "You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter.  The attachment may be modified in the future if you and the Company agree in writing."  Each of the Employed Defendant's GPA contains an attachment stating in some specificity a statement of responsibilities.  Thus, INVESCO does not have sole discretion to assign the Employed Defendants their specific duties, rather any change in assignment must be agreed upon by both INVESCO and the Employed Defendant.[5]

Therefore, for purposes of this motion with leave to review upon further discovery, the Court

---

[5]  INVESCO argues that the statements of responsibility contained in the attachments to the GPAs are broad, allowing them a great deal of discretion on which duties within those categories to assign to the Employed Defendants.  Even assuming that this statement is correct, this does not give INVESCO the discretion to withdraw all duties of employment.

finds that INVESCO breached the GPA when it placed the Employed Defendants on paid administrative leave.

Having assumed that INVESCO breached the GPA by placing the Employed Defendants on administrative leave, the Court must now determine whether INVESCO cured this breach pursuant to the terms of the GPA. Section 3.C of the GPA provides that a Global Partner may terminate their employment effective immediately if the Company, after written notice, has engaged in any continuing violation of the GPA and has not cured such violation within a reasonable period of time. There is no indication in the GPA as to what constitutes a reasonable period of time.

INVESCO placed the Employed Defendants on administrative leave on March 27, 2007. The Employed Defendants notified INVESCO by letter dated April 17, 2007, that the treatment of the Employed Defendants was in clear contravention of the terms of the GPA. On April 27, 2007, INVESCO indicated that it would return the Employed Defendants to active employment on May 21, 2007. In ruling on INVESCO's Motion for Temporary Restraining Order, this Court required INVESCO to provide the Employed Defendants with their employment duties by May 21, 2007. On May 30, 2007, the Employed Defendants returned to work.

The Employed Defendants argue that this attempt to cure is inadequate, citing the change of offices, their isolation from clients and staff, and their decrease in responsibilities.

This Court finds that for purposes of this motion, INVESCO's attempt to cure their breach was inadequate. The Court finds that INVESCO was not required to place the Employed Defendants in the exact same position as that they occupied on the day they tendered their notices; however, INVESCO has failed to provide the Employed Defendants with any duties consistent with their positions as Global Partners. This is a violation of the GPAs. The description of their duties set

19

forth in INVESCO's letter of May 21, 2007, in the abstract might be sufficient cure.  The implementation of those letters and the actual duties and responsibilities assigned are significantly different.  The Court does not believe that solution will change in the future.  Therefore, this Court finds that, for purposes of this motion, there is a substantial likelihood that INVESCO breached the Employed Defendants' GPAs.

## II.     INJURY

INVESCO asserts that it will suffer irreparable harm if the Defendants are not enjoined from working for Deutsche, recruiting INVESCO employees in violation of their GPAs, and disclosing or using INVESCO's trade secrets and other confidential and proprietary information.

INVESCO claims that it has lost business since this action began and it is reasonable to assume that further business would be lost if the Employed Defendants were permitted to begin working for Deutsche prior to the expiration of the twelve-month notice period.  INVESCO asserts that this would also result in a loss of customer goodwill.  INVESCO claims that the failure to prohibit Defendants from commencing or continuing their employment with Deutsche would irreparably harm INVESCO's competitive position with respect to Deutsche as there exists a risk that INVESCO's trade secrets and confidential business information would be disclosed to and misused by Deutsche.  Finally, INVESCO claims that it will suffer irreparably injury if this Court does not enjoin Defendants from assisting in the recruitment of current INVESCO employees.

When economic loss can be calculated and compensated by monetary damages, there is generally no claim for irreparable injury.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  "However, an injury is not fully compensable if the nature of the plaintiff's loss would make damages difficult to calculate."  *Id.*  "The loss of customer goodwill often amounts to

irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* at 512 (citations omitted); *see also Merrill Lynch, Pierce, Fenner & Smith v. Grall*, 836 F. Supp. 428, 434 (W.D. Mich. 1993) (finding that plaintiff had demonstrated irreparable harm where plaintiff showed that it would lose good will; client trust, confidence, and confidentiality; and competitive advantage).

The Defendants argue that INVESCO can not show that it will suffer irreparable harm as Defendant Paas has been working for Deutsche since his employment was terminated in late March 2007. Defendants state that if Paas has been revealing confidential information as INVESCO claims, than any harm to INVESCO has already been done and that if INVESCO is entitled to a remedy, if any, it is to damages not injunctive relief. The Court does not find this argument convincing. The departure of the Employed Defendants may result in additional business loss and damage to internal operations. Additionally absent injunctive relief, Defendants may attempt to recruit current INVESCO employees or reveal additional confidential information.

The Court finds that absent the entry of a preliminary injunction, INVESCO will suffer irreparable harm.

## III.    HARM TO OTHERS

The Defendants argue that they will suffer substantial hardship if the Court were to grant INVESCO's motion for preliminary injunction as they would remain bound by the INVESCO GPA but would be prevented from carrying out the duties and responsibilities contemplated in the GPA.

This Court finds that the Defendants have been harmed by INVESCO's failure to allow them to carry out their duties and responsibilities as contemplated by the GPA. However, the Court finds

that the severity of this harm is lessened by the fact that INVESCO intends to pay the Employed Defendants their current salaries and benefits and that the Employed Defendants will maintain eligibility for bonuses, stock options, and restricted stock awards.

## IV.   PUBLIC INTEREST

The Defendants argue that the public interest can not lie with preventing the Defendants from working in their field for eighteen months where INVESCO did not bargain for a covenant not to compete.  This is particularly so when there is a likelihood that Defendants will prevail on their claim that INVESCO provided inadequate cure for their breach.

The Court agrees that it would be counter to Kentucky public policy to enforce a covenant not to compete not bargained for by the parties.  *See EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 414 (S.D.N.Y. 1999).  Although the GPA did not contain a covenant not to compete, it did contain a notice period as well as fiduciary duties and constraints on Defendants' abilities to recruit INVESCO employees and disclose confidential information.  In enforcing any of these provisions, the Court is not holding Defendants to a covenant not to compete not explicitly bargained for.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is GRANTED IN PART and Defendants' Motion for Preliminary Injunction is GRANTED IN PART.

In light of the fact that the Court has found a likelihood of success on Plaintiff's claim of breach of fiduciary duty and a likelihood of success on Defendants' claim for subsequent breach of contract by INVESCO, the Court will balance these findings.

The default notice period in the GPAs was four months.  The Court finds that this was the minimum amount of time that INVESCO required for a transition period to prevent irreparable harm

22

to its interests.   Therefore, the Employed Defendants are enjoined from leaving the employ of INVESCO for a period of four months from the date that they tendered their resignation notice. During this time, INVESCO will continue to pay the Employed Defendants their current salaries and benefits and maintain their eligibility for bonuses and stock options and restricted stock awards.   The Employed Defendants will not disclose or use any of INVESCO's trade secret and/or confidential information during the remainder or their employment or for six months following the effective date of the termination of their employment relationship with INVESCO.   Defendant Paas will not disclose or use any of INVESCO's trade secret and/or confidential information for six months following the effective date of the termination of his employment relationship with INVESCO.   The Defendants will not solicit or hire any INVESCO employees for a period of six months after the effective date of the termination of their employment relationship with INVESCO.   Defendants will not solicit the business relationships they developed or acquired while working for INVESCO or another company affiliated with the AMVESCAP Group for a period of six months after the effective date of the termination of their employment with INVESCO.   The Court finds that this Judgement appropriately balances the harms faced by INVESCO and Defendants while taking into account the public interest.

An appropriate order shall issue.